All right, our next case is Washington v. Federal Bureau of Prisons. Ms. Arfa, did I pronounce that correctly? We'll hear from you. Judge Agee, it may have pleased the Court, Leslie Arfa of Sullivan and Cromwell for Appellant Berl Washington. While the record in this case is relatively lengthy, the remaining issues in dispute are actually quite narrow. Mr. Washington suffers from glaucoma and has been in BOP's care for nearly two decades. During that time, his eyesight has gone from meaningful to practically nonexistent. There is no dispute that multiple ophthalmologists recommended surgery on Mr. Washington's left eye and that Mr. Washington did not receive that surgery or even a follow-up appointment for nearly nine months. There is also no dispute that no fewer than four ophthalmologists recommended that he receive assistance administering his eye drops. Yet BOP overrode those specialists' instructions as well. It's finally undisputed that Mr. Washington's eyesight deteriorated in the meantime and that his eye pain increased. BOP tries to disturb the chain of causation here by pointing to Mr. Washington's purported incidence of noncompliance. But it's blamed the victim's strategy. Doesn't this really come down to you've got a battle of medical experts, which we see that all the time, and the District Court credited one more than the other. There's some evidence in the record to back that up. Why isn't that the end of it? So we don't think this is the typical battle of the experts, Judge Agee, and that's for a couple of reasons. On both breach and causation, the District Court made legal determinations, and we believe those determinations were in error. And let's start with breach. The District Court credited the government's expert, Dr. Ulrich, over Mr. Washington's expert, Dr. Kotecha, because Dr. Kotecha didn't have expertise in administrating medicine in the prison setting, and she couldn't point to the specific medical provider within BOP who was responsible for withholding care. And that doesn't work for a couple of reasons. The first is that they weren't testifying about administration in the prison setting, and there was actually no dispute on this record about who was responsible for scheduling the care. That was Dr. Lawrence at FCI Williamsburg. So it really wasn't in dispute, and you can imagine why you wouldn't want to impose that requirement on a plaintiff in an FTCA case, because they would almost always need to find either a BOP employee or a former BOP employee to testify. They weren't admitted to testify about the prison administration, and so it was legally incorrect to falter for that reason on breach. I thought Dr. Ulrich testified to the effect of even if all these factual events occurred, that still did not establish to a reasonable degree of medical certainty that the Bureau of Prisons' decisions made any difference. That's also correct, Judge Agee, but the reason he made that determination, and that goes to the second error, which is on causation, is that he found as a matter of modern medicine, it's just not practical to determine causation when it comes to advanced glaucoma. And that didn't work for several reasons. The first is he contradicted his own testimony. He testified that lack of treatment always causes glaucoma to increase, and he didn't say over any period of time. He said it always causes glaucoma to decrease as long as there's lack of treatment. And the district court didn't say why she was overturning the recommendations of not only Dr. Kotecha, but also the other experts in the record who said that absent medical care, deterioration of vision will occur. And those experts were doing what Dr. Ulrich said was impossible to do, which was to attribute causation when it comes to glaucoma. The truth is that glaucoma is no different than any other disease. The only two experts you had here were Ulrich and the plaintiff's medical expert. Is that right? Ulrich is the government's medical expert, and the plaintiff's medical expert was Dr. Kotecha. So those are your only two experts. None of these other doctors testified. They did not testify, but their recommendations were in the record, Judge Agee. And again, they all did what Dr. Ulrich said was impossible. And I will say, we cited on page 12 of our reply several instances where courts didn't have any trouble finding causation when it comes to advanced glaucoma. And that's because glaucoma is no different than any other progressive disease. It might be difficult. Counsel, that argument, you're characterizing it as a legal error. And I wonder if that's right. I mean, the doctor said he didn't think causation was established. There's testimony about how his eyesight was from the time he got there. There's testimony about his compliance or lack of compliance. There's all this stuff over this time period that are potential events that would cause, number one, the disease to progress naturally. Number two, his noncompliance. And number three, the fact that even these surgical interventions aren't necessarily, can't be effective and can make things worse. And given all that in the record, I get there's very different testimony on the other side. So I certainly understand that. But given that, I'm just having trouble how we would say, as a matter of law, a district court erred, at least on the causation side. So a few points in there that I want to tease out, Judge Quattlebaum. The first is that I don't think it's a fair representation of the record to say that Dr. Ulrich made a factual and not a legal determination. And that the district court made a legal determination there as well. Because what Dr. Ulrich testified was that, quote, as a matter of modern medicine, when it comes to advanced glaucoma, it's just too difficult to determine causation. That really wasn't based on the specifics of the facts here or the plaintiff's glaucoma. Now, when it comes to the noncompliance, he did... So what? So he says that, you disagree with it, there's evidence on the other side. Why is that wrong for a district court to say, look, I think that has some appeal to me? Well, because what the district court said was not, on this record, it's impossible to determine causation when it comes to advanced glaucoma. But due to the advanced nature of glaucoma and how it progresses, it's impossible to determine causation. It would be as if, to take a different example, if the judge found it's just impossible to determine causation when it comes to heart disease. There's no way to find medical malpractice when it comes to some sort of heart surgery. We do think that that is an error of law. But I do want to turn to the noncompliance, because I think that's critical here on this record. We think we can put the noncompliance in two different buckets. And in one bucket are instances that just can't qualify as noncompliance at all. And the best example of that is the only example the government can come up with during the relevant period when he was being withheld surgery on his left eye. And that's at page 22 of the government's brief. They cite to JA82, but if you look at what the government's citing, it's a nurse's note where the nurse observes that Mr. Washington accidentally, and the keyword there is accidentally, misuses his eye drops because he can't see. And the reason that's critical, Judge Quattlebaum, is because that's the only incident of noncompliance. There's no evidence in the record that he would just take his medicine and squirt it out and come back to them and want more. Or that if his favorite nurse wasn't there to put the eye drops in, he wouldn't do it. And that they had had a long period of observation in the different facilities where he could put the drops in. He just wasn't going to do it. Right. So I think the timeline here is critical, Judge Agee. When it comes to the period from August 2014 to May 2015, and that's the relevant period when he was being withheld surgery on his left eye, there actually weren't those incidents of squirting out bottles, et cetera, that the government points to later down the road. Now, obviously, we disputed at trial whether he was really misusing his medication. But at a minimum, when it comes to causation, if there aren't incidents of noncompliance during that nearly nine-month period when he was being withheld surgery, it's impossible to say that the government has carried its burden establishing contributory negligence. That is, that he was over 50 percent responsible for the deterioration in his eyesight. And if they can establish contributory negligence, then noncompliance would detract from the damages, but it wouldn't go against liability. Now, yes, there are incidents after 2015, so that's after the relevant period when it comes to the surgery, when BOP documented incidents of noncompliance. And of course, at trial, we did dispute whether that was noncompliance. But I do think you have to put those incidents in context, Judge Agee. We're talking about someone who's been withheld medical care for years, whose eyesight... This is all a factual argument, right? So the district court held a trial and made findings of fact, right? So I don't want to stop your argument, but I'd like for you to maybe focus on how you can meet your heavy burden to overcome the trial court's factual findings that the plaintiff was more negligent than the BOP here. How are we in a position to disagree with that weighing of the negligence? Right. So we take the point on the standard of review here, Judge Rushing, but we do think the district court made legal conclusions when it was arriving at that decision. When it comes to comparative negligence, what's the legal conclusion that we... What's the legal error that would get victory for you on comparative negligence? So on comparative negligence, we do think that underlying that decision were some of her findings about how causation is impossible to determine when it comes to advanced glaucoma. And I will say this, the comparative negligence finding was really a throwaway finding at the end of her decision. And the reason the government is focusing on it on appeal is because comparative negligence would only go to damages and not liability. But I think whatever the standard you're applying, Judge Rushing, I don't think it matters because when we look at the surgery, if there are no incidents of noncompliance during the relevant period, it can't possibly be that the government carried its burden of establishing comparative negligence. How could it be that it carried its burden of establishing that he was more than 50% responsible for his decline in vision if he didn't do anything to delay the surgery? Why are we looking at this artificial period? I mean, if the question is who's more responsible for the decline in his vision, it seems like we would be looking at the whole period in question, not just how much evidence is there of his negligence during the months when the surgery was delayed. I mean, why are we just looking at that period? I take the point about timing, Judge Rushing. I think the reason we're starting the relevant period in August 2014 is because that's when the surgery was recommended, and there's no dispute on the record that that's the case. And we know that for nine months he didn't receive any care, and his vision deteriorated. That doesn't really answer the question I think Judge Rushing asked, which is why aren't we looking at the whole period? Well, I think the law is clear on this, Judge Agee, and we discuss it in our briefs, that noncompliance outside the relevant period doesn't absolve EOP for withholding medical care during the relevant period. And that makes sense at a high level, because just because someone's noncompliant at one time, it doesn't surrender their right to care for the rest of their lives, just as it's true. So is your argument that there was no evidence of noncompliance prior to this period? There was some evidence of noncompliance prior to this period, and that gets to my point. And there was only one that the government points to in its brief. But the point is that, and the Lister case from South Carolina bears this out, just because a plaintiff denies care at one time or is noncompliant doesn't surrender his right to care going forward. And the same is true if not doubly so. Well, he wouldn't surrender it, but it's not a fact that you can ignore. Well, actually, this Court said as much in the Smith case that noncompliance outside the relevant period, you can't infer noncompliance during the relevant period just based on noncompliance alone. And there the relevant period was only two weeks long, and the noncompliance happened shortly thereafter. So I think this Court has already said as much, and we're on even stronger footing than the plaintiff in Smith, because there the government, it was at the pleading stage. The government was free at trial to put in evidence of noncompliance during the relevant period if it wanted to. Here, the government spent the entire trial putting in evidence of noncompliance, but it couldn't put in evidence during the relevant period when it comes to the surgery. So far, you've addressed your Tort Claims Act claim. Do you want to move on to the reasonable accommodation parts before your time expires? Sure. I would love to, Judge Agee. Yeah, I think the district court's errors here were clear, and just going back to the standard of review in Judge Rushing's question, we do agree that most of these errors are reviewed under the clear error standard, but that standard is not toothless. And here we think the errors are apparent from the record. That's most obvious when it comes to the Braille and the lock. The district court found that there was no substantive evidence that Mr. Washington was interested in learning Braille. I know you're trying to get it in. Could you say that again a little more slowly? The district court found that there was no substantive evidence that Mr. Washington was interested in learning Braille. So little or no. But the record is clear that he had requested it no fewer than four times, and that's in 2014, 2015, and 2016. And remember, he filed suit in 2016. So we really don't know what we're arguing with the government on this point. He's entitled this accommodation. The government provides it as a matter of ordinary course, and he's pursuing this lawsuit for eight years to get it. Clearly there's evidence in the record, and more than just a little, that he wants to learn Braille. I thought the district court said something to the effect that there was no evidence that he currently wanted Braille. Not that that's necessarily relevant. Right, and we don't think that's the right framework to look at this, because it seems like what the government is arguing today is that he had an obligation to update the court as the trial went on about his interest in Braille beyond his testimony. We don't think that can be the right standard in the rehabilitation. That's fair, but the district court also said when he was presented with the opportunity to get Braille, he refused to do what was necessary. When the request was granted, there were paperwork requirements, and he wouldn't fill those out. So I think that was part, one, just that you have a duty to keep updating me of your request. You may have made some requests, we granted one, when there's a dispute about whether it was requested after that. Someone says yes, someone says no, but the time where it's granted, Mr. Washington did not do what was necessary from a paperwork standpoint. Right, so there was a hearsay testimony from Dr. Ulrich that he had declined to sign a form in 2017 that offered him Braille. Why is that hearsay? Well, because he had no direct knowledge of it, and we don't know what he was referring to when he said that. There was no evidence in the record of the 2017 incident. Is it admission by a party? Well, I don't think it would qualify as an admission, but regardless of what you think of the hearsay rules, and I'm sure we could debate those for a while, there was this oblique reference, but we don't think the fact that he was offered it once apparently, although he continues to dispute that, would forever surrender his right to it. Why don't you give us a quick one minute on the glasses and the security lock? Sure, so I think the lock, the error on the lock was even more apparent. The district court found that BOP had a valid security reason for denying the lock, but BOP had never offered a security rationale, let alone justified it. And remember, the relative comparator here isn't whether it would be dangerous or pose a security concern to give an inmate a lock. The district court conceded at footnote 21 of her opinion that all inmates are given a lock a standard issue. The question would be whether giving Mr. Washington a lock that's modified so that he could use it would pose a security concern. There's just no evidence in the record that it would. The government tries to come up with one in its brief that it somehow would be a security concern for him to be able to keep his medicine, but it's just not plausible and it's not the reason that they gave below. On that point, we perhaps could look at the record if there was another reason that would support that, but is there any other evidence in the record with respect to the lock that I didn't see? No, there really is not, Judge Quattlebaum. There's vague references to discretionary authority, but there's no specifics about why BOP exercised that discretionary authority here. All right, very quickly, tell us about the glasses. Sure, so quickly on the glasses, there's no dispute that it was prescribed by a specialist, these tint number four glasses, because it would help him walk around the prison without feeling pain. The district court deferred to BOP's policy against providing these glasses, but at a high level, that doesn't work because almost every plaintiff I thought there was evidence that they did that because they thought the heavier tint was a tripping risk. There is evidence of that, although the government also said that there's no meaningful difference between tint number three and tint number four. We just don't see how it could both cause a tripping risk and there'd be no meaningful difference. But taking that aside, we're again taking the specialist's word for it here that it would cause a meaningful increase in his ability to navigate the prison. And remember, all we're asking for is a meaningful, reasonable accommodation. The BOP already provides tint number three. It's never explained why it would be some sort of undue hardship to present tint number four. He's asking for the most basic accommodations here. I think we've given you a lot of extra time, but you've got some rebuttal time. Thanks, Judge. Mr. White. Thank you, Your Honor. May it please the Court, Graham White for the Bureau of Prisons. The district court correctly found that BOP made extensive efforts to both treat and accommodate plaintiff's glaucoma throughout his time in BOP custody, but that they were thwarted at every turn by plaintiff's self-sabotaging behavior. As the district court made clear in more than 160 pages of comprehensive factual findings, plaintiff consistently and intentionally refused to take his prescribed glaucoma medications. He was abusive towards BOP medical staff and towards other inmates who were assigned to assist him with his disability, and he refused to consent to multiple recommended surgeries that his outside medical providers had recommended. Now, I'll just start with this purported period of noncompliance with the eyedrop medications and whether that happened during the nine-month period or outside of it. What the district court found, and I'm quoting directly from the district court's opinion, is that the plaintiff was, quote, serially noncompliant with his eyedrop medications during this August 2014 to May 2015 period. What's the evidence in the record that supports that finding? Yes. So the district court cited a BOP medical record showing that the plaintiff consistently ran out of his eyedrops every month, showing that he was not taking them as directed. Do those records reflect that nine-month period? Yes. It was during the nine-month period. So you have that record showing that he was running out, like, way too early, that if he had been taking the medication as directed, that wouldn't have happened. But even apart from that, there is overwhelming evidence that he was noncompliant with the medications both before and after that period, which I think is probative of his behavior during that time. So what's your best evidence that he was noncompliant before that period? Well, I think before the period, there were multiple surgeries, for example, where he refused to attend his postoperative care. Let me emphasize, I think the concern here is more with the after. There's more substantive evidence with respect to the period after May 2015. And just to give you, Your Honor, one example, I think during the period from 2015 to 2017 when he was at FCI Estill, according to one BOP medical record, he affirmatively refused his eye drop medications the majority of the time that they were prescribed to him. There were between roughly 70 and 80 affirmative refusals to take the medication just during a two-year period. So there is plenty of evidence showing that he wasn't taking the medication as prescribed. And as the district court found, he knew how to self-administer the medications. He was seen by BOP staff self-administering the medications on numerous occasions. He would show BOP staff that he could do it, and then he simply wouldn't do it. And let me also speak to... Counsel, can I ask a... I'm sorry to interrupt you, but I want to get your response to the argument that the district court committed legal error by crediting an expert who said that it was medically impossible to determine causation in this situation. Do you have a response to that? You know, I think what the district court is saying is that... Well, first of all, I think these are factual determinations that the district court is making. This is a classic battle of the experts here. But with respect to determining causation, the district court is saying, in crediting the government's expert in doing so, that when you have a patient with end-stage glaucoma, it's very difficult to ascribe, to attribute any worsening of a plaintiff's vision and increase in pain to a lack of surgical intervention. And there is ample evidence in the record to support that. Just to take a couple of examples. In the time period right around where the plaintiff's outside provider, Dr. Nataitis, had recommended this laser diode surgery, immediately before that, the plaintiff was seen by other outside ophthalmologists who said... who recommended against surgery on the ground that, look, this is going to do more harm than good. And that was borne out, in fact, by plaintiff's history, where he had underwent another surgery on his right eye in 2012, I believe. That was unsuccessful. And underwent another cataract surgery in July 2014. That was not successful. So there is... it is not at all clear from the record that, had plaintiff undergone this surgery in May 2015, that he's challenging that this would have made any difference at all. And I'd like to also just provide a little bit of context, if I could, around the recommendation and why it was not ultimately followed until May 2015. So at the time that Dr. Nataitis is making this recommendation in favor of a surgery in August 2014, the plaintiff had just undergone another surgery by the same provider a month earlier. That did not go well. The surgery was not successful on its own merits, but also because the plaintiff was exacerbating the problems by not attending his postoperative care. And that was not the first time that this happened. And that was on a different eye than... Different eye. Okay. Different eye, but by the same surgeon who is recommending this additional surgery. And that comes on the heels of another surgery in 2012, where a plaintiff also underwent cataract surgery on his right eye. That was not successful. And again, the plaintiff was making things worse by not attending the postoperative appointments. So ultimately, when BOP is making a decision on whether to approve a surgery that is recommended by an outside provider, it involves a cost-benefit analysis where BOP has to consider what is in the prisoner's best interest here. And what the record shows is that these surgeries have a very low success rate when you're talking about end-stage glaucoma, and the plaintiff is not helping his case by, you know, not only refusing to take the medications, but also not attending the postoperative care. Was there testimony that the nine-month delay was because of that, because he did not carry out his self-care with that prior surgery? I recall the testimony or the evidence that there was that prior surgery. I recall the evidence that he didn't do what he was supposed to do afterwards. Was there testimony that the reason it was not scheduled was because of that? Yes. So Daniel Whitehurst... This was Whitehurst. Yes, Mr. Whitehurst, who was on the medical staff at FCI Williamsburg during the relevant time period, explained that the plaintiff's, again, noncompliance was a factor in this decision. And apart from that, we had the government's expert witness, Dr. Ulrich, who was explaining that BOP officials have to have some latitude in deciding whether to approve a recommendation from an outside provider. It's not the case that... Did he limit his opinion to prior, nonconformance prior to this eight- or nine-month gap? Did Dr. Ulrich? I'm sorry. Whoever you were just... Yeah. The expert to prior. Yeah, whoever you just identified. Yeah, so when Dr. Ulrich was making this opinion, he was basing it not just on the August 2014 recommendation, but also the recommendations from other outside ophthalmologists in 2013 who had examined the plaintiff and said, we need to, quote, stop fiddling around with his eye because we're going to make things worse. And that partially formed the basis of Dr. Ulrich's conclusion as well. Unless the court has any... Well, let me also just say, before I move on to something else here, that at some level, the time in which the surgery was ultimately scheduled is a little bit beside the point because the plaintiff refused to have the surgery when it was provided to him. He went to the surgery after it was approved. He was attempting to leverage... This was in 2015. This was in 2015. When he arrived at the outside clinic to get the surgery done, he was attempting to coerce the outside provider to prescribe him certain medications. The provider refused to do it, and the surgery didn't happen. And remember, these are the providers... So what's the point of that looking backwards? Well, I think it just shows that with respect to causation, we don't know whether this surgery would have made any difference if it had gone through because it just didn't happen in May 2015. And then one other point is that, you know, so this surgery didn't go forward in May 2015 because of the plaintiff's own actions, but ultimately it didn't happen until 2017. And I know that the plaintiff isn't challenging that delay that followed, and so we don't really get into it into our briefs, but I think it's important context for the court to understand. The reason there was a delay of about a year and a half after that is because the plaintiff refused to see an ophthalmologist for another year after that. So there is ample evidence in the record to support the district court's finding that the plaintiff's own actions here are primarily responsible for his deteriorating vision and increased ocular pain. Now, with respect to whether he needed assistance with his eyedrops, I'll just reiterate that the district court found that the plaintiff, again, did not need assistance. He was seen administering the eyedrops on his own without help, and even if he did, BOP provided him with relevant assistance at every facility in which he was housed. They would place him on the pill line where he could go and have BOP staff administer the eyedrops for him. A lot of the times he just simply wouldn't go to have the eyedrops administered, and BOP also offered him devices, like an auto-drop device, that would assist him with administering the eyedrops. He refused to accept it and threatened to smash it on the ground. So, again, BOP is making, trying to bend over backwards to accommodate the plaintiff's condition here and are just being afforded by the plaintiff's own self-sabotaging behavior. What's the evidence in the record that supports the district court's decision that to deny the accommodation of an alternative lock for security reasons? Sure. So here's what's in the record on that. So we put forward two witnesses below. We have Lieutenant Kavinsky, who is the occupational therapist, and Carl Luckfeld, who is the administrator for the Special Populations Branch. Both of those witnesses testified at trial that an accommodation like this is up to the discretion of security personnel and that it was not, and that they exercise that discretion to deny the request. That's at JA 181 and JA 193. So how does that relate to whether or not it's a reasonable accommodation? Well, I think for a couple of reasons. In terms of whether it's a reasonable accommodation, let me say a couple of things in response to that. Well, let me go back. Sure. If you look at it and compare it to the tinted glasses, there is an explanation in the record as to why this wouldn't work, why it wouldn't be a reasonable accommodation, because it would make him trip. Maybe it would, maybe it wouldn't. But there was an explanation for that. But here all we have is, well, it's discretionary for security purposes, but it doesn't really explain why there can't be a reasonable accommodation, notwithstanding that policy. Because there is evidence in the record showing that a plaintiff abused his locker by hoarding medications. And just to be clear, this was not just him hoarding his eye drop medications. The district court found, and quoting again, this is at JA 143, that the plaintiff was hoarding, quote, hundreds of pills of many different drug classes, most of which were prescription medications. All right? It's not that big of a leap to say that one form of contraband in a locker could lead to another. So we have these two witnesses, Lieutenant Kaminsky and Carl Lachfeld, who are saying that this was denied for security reasons. There is evidence in the record to substantiate that he was hoarding his medications in his locker. And this is an area where judicial deference to it. Well, couldn't they have, if they gave him whatever this alternative lock is, I mean, couldn't they have entered the locker at any time, just like they could with any other inmate's lock? Yeah, so I'm happy to answer that, but I just want to preface this by saying that this explanation is not in the record. But my understanding from talking to BOP about this is that the standard issue inmate combinations have a master key that BOP staff can go and open at any time at the officer's discretion. The alternate vision-impaired locks don't have that feature. And so even if BOP were to write down the combination, the inmate could change it at any time. So, look, BOP correctional officers could ultimately take, I suppose, a bolt cutter and force open the lock, but that's not something that they could do quickly. And so I think in this particular case, correctional officers have an interest in being able to quickly search contraband, especially when we have an inmate like the plaintiff who is not only hoarding medications, he has a history of disciplinary infractions that have landed him in the special housing unit on multiple occasions. So I think this is an area where the decision of BOP officials to deny the lock is very reasonable, and there's evidence in the record to support that. Wasn't there, just to refresh my memory, I thought there was testimony that some inmates are given these alternate locks, so in some cases it is a reasonable accommodation? Yeah, so I think it depends on the circumstances surrounding the particular inmate who's requesting it. Right, so the justification is for this particular inmate that he poses a particular risk that other inmates don't? Yes, and that is supported by the record. And where was that justification given by BOP to the district court? Well, what we have in the record is that, again, we have the two witnesses, Kaminsky and Lutfeld, who said this is up to the discretion, it was denied, and there is evidence in the record to support why that would be the case, again, because of hoarding medications. We didn't think there's a need to say more than that, because I think it doesn't require a lot of guesswork. Well, did those two witnesses say that the hoarding of the medicine was the security reason? There was no elaboration as to what the security reason was, but this court can affirm for any reason that is apparent in the record, and the record makes clear that this inmate posed some security risks because he was, again, hoarding contraband and had a long disciplinary history. Unless there are any further questions of the lock, I'll just quickly touch on the Braille and the tinted glasses. With respect to the Braille, as we argue in our brief, there's no live controversy here. The last time that the plaintiff requested Braille was in 2017. DOP provided him the Braille, and he refused to come and sign the paperwork to get it. He hasn't requested Braille since then. We're happy to give it to him. There's no issue with that. But as the district court found, there is no current request for Braille, and so that does not entitle the plaintiff to obtain any declaratory injunctive relief. The entire basis of the plaintiff's claim for Braille here is that he was purportedly denied Braille materials in 2014 and 2015, and that is not enough to show a lot of controversy. And finally, with respect to the tinted glasses, the Rehabilitation Act requires reasonable accommodations. He requested tint number four. He got tint number three. We don't even know the extent to which tint number three would have been effective because plaintiff refused to use the tint number three glasses. And beyond that, the last thing I would say on the glasses is that a plaintiff is only entitled to relief under the Rehabilitation Act if they were denied meaningful access to prison services because of being rejected an accommodation, and there is no evidence in the record to show that the tint difference here had any impact on the plaintiff's ability to access prison services. So unless the Court has any questions, we would just ask the Court to affirm. Thank you very much. Appreciate it. Ms. Arfa, you've got some rebuttal time. Thanks, Judge Agee, and I'll just make a few points here since I know it went over the first time. The first thing I'd just like to clear up quickly is this issue about evidence of noncompliance during the relevant period from August 2014 to May 2015. Again, there really isn't any. The government can only point to the pharmacist's note and the nurse's note observing a JA-83 that he sometimes runs out of medication because he struggles to apply it, and that's really at the heart of our FTCA claim for assistance with the eye drops and our Rehabilitation Act claim for assistance with the eye drops. So I just wanted to clarify the record here, and thus it was a legal error to conclude that noncompliance would detract from liability during that nine-month period. A couple of the arguments the government's raising now are new arguments, and they just aren't in the record below. There's now a new argument that actually he didn't need the surgery at all because in 2013 a specialist had recommended against it. Now, again, we're talking a year earlier about a progressive disease like glaucoma, but even there the record is clear that actually two different specialists thought he needed the surgery then. But whatever you think about what happened in 2013. I understood that argument. Maybe I misunderstood it, and please correct me. But I thought I understood that argument related to causation, that it's hard to determine his current condition was caused by the lack of surgery because some people say, hey, surgery may not help and may make things worse. Maybe I got that wrong, but I thought it was more of a causation than they were saying he didn't need it at all. Understood, but I think first it's misleading to say that experts didn't think he needed it in 2013 when several did. Now, on the causation point, BOP says now that the surgery has a low success rate. That's not in evidence. That wasn't testified to at trial. But we also know that any surgery doesn't have to have 100% guarantee of success to succeed. Dr. Kotecha testified that this gap in care caused his eyesight to decrease, and Dr. Ulrich, the government's expert, also testified that lack of care always causes vision to decrease. Now, on the Rehabilitation Act claims, with regards to the lock, we're just way outside the record now, and we're trying to come up with reasons for why BOP declined the lock. But BOP didn't testify as to, never offered evidence as to why it declined the lock beyond alluding to a vague discretionary reason. I think you're right. Your colleague conceded he was given the details of how the locks work, and that wasn't in the record. But there is a finding that the lock was not granted. The request was not granted because of security reasons. And the witnesses didn't attribute that to his hoarding of medication. But if they didn't, but the record indicates he does do that, just assume the record indicates he hoards that medication, can we not use that as an alternative basis in the record to support that finding? Sure. So it wouldn't be a factual finding the district court made that you'd be reviewing for clear errors. You'd be looking at the weight of the evidence here, and you'd have one vague allusion to a security concern relating to hoarding medication. We don't really see how that would be a security concern. If anything, it might be a medical concern. The only security concern here goes the other way, and that's the evidence is clear that Mr. Washington's cellmate was putting knives in his locker as a threat, and Mr. Washington was unable to lock him out because he couldn't use his lock. When we talk about Lieutenant Commander Kaminsky's testimony, all he said at J1124 was that the standard issue lock is very hard to see, but that we denied this lock for a discretionary reason, not security and not related to hoarding the medicine. We just think it's not plausible to say that BOP has carried its burden of establishing an undue hardship in providing him this lock when they provide everyone else a lock. And on the Braille, the evidence is clear too. Again, the government's contriving a new legal requirement that when someone's making a rehabilitation act claim, they have to keep coming forward with more and more live requests as the case proceeds and as you go to trial. Well, the government says the record shows that Mr. Washington did request Braille. They offered it to him, and he refused. Again, we really don't think the record is clear, and that's certainly not a basis that district court rules. But again, offering it one time in 2017, they've continued to deny it. This lawsuit's gone on from 2016 to 2024. Right, but what's the evidence that he's, since he refused it in an earlier time, that he's asked for it again? Well, again, we don't think he refused it. The best the government can come up to is vague testimony that he couldn't sign a form because he didn't have an inmate companion. He had no idea, and he testified at trial, that he'd ever been offered Braille. But he's continued to pursue it to this day, and the government still says. How has he continued to pursue it other than through the lawsuit? Well, since we're going outside the record, he has continued to. Well, is there anything in the record that shows that he has pursued a request for Braille since arguably the record shows he refused it at an earlier time other than his complaint? Well, there's his testimony on the subject, but there's also the fact that we're looking at the timing here. He requested four times from 2013 to 2015, then filed suit in 2016. And remember, all we're asking for is injunctive relief here, Judge Agee. He wants it. He's been pursuing it for eight years, and we're just asking the government to provide it, which they do to inmates all the time. We're not asking them to transform this prison system for him. And just quickly, on the glasses, we think it was pursued. I don't want to belabor this, but the government just said, you know, if he asks for it, we'll give it to him. But apparently he hadn't asked for it since 2016. Well, they're not quite saying if he asks for it, he'll give it to him, because he's asking for it through this lawsuit, and they're not conceding error. They're not saying we'll give it to him right now, and we're going to moot this case out because we're conceding error here. They're not saying that at all. They're standing up here and saying he doesn't deserve that accommodation because he apparently doesn't want it. And I think that's a very different argument, Judge Agee. All right. You got anything else for us? Just quickly on the eyedrops, VOP says the difference isn't meaningful, but also it made him fall over, and the specialist's recommendation at JA 498 contradicts that. With that, I thank the court for the considerable time it gave to this and the questions. All right. We thank both counsel for their arguments. We're going to come down and great counsel.
judges: G. Steven Agee, A. Marvin Quattlebaum Jr., Allison J. Rushing